APPEAL,CLOSED,JURY,TYPE–B

# U.S. District Court
# District of Columbia (Washington, DC)
# CIVIL DOCKET FOR CASE #: <u>1:17–cv–00913–ESH</u>
# *Internal Use Only*

| | |
|---|---|
| DERIPASKA v. ASSOCIATED PRESS | Date Filed: 05/15/2017 |
| Assigned to: Judge Ellen S. Huvelle | Date Terminated: 10/17/2017 |
| Cause: 28:1332 Diversity–Personal Injury | Jury Demand: Plaintiff |
| | Nature of Suit: 320 Assault Libel & Slander |
| | Jurisdiction: Diversity |

**Plaintiff**

**OLEG V. DERIPASKA**          represented by     **Jonathan H. Sherman**
BOIES, SCHILLER & FLEXNER, LLP
1401 New York Avenue, NW
11th Floor
Washington, DC 20005
(202) 237–2727
Fax: (202) 237–6131
Email: jsherman@bsfllp.com
*ATTORNEY TO BE NOTICED*

**Jonathan David Schiller**
BOIES, SCHILLER & FLEXNER LLP
1401 New York Avenue, NW
11th Floor
Washington, DC 20005
(202) 237–2727
Fax: (202) 237–6131
Email: jschiller@bsfllp.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**ASSOCIATED PRESS**          represented by     **David A. Schulz**
BALLARD SPAHR LLP
919 Third Avenue
37th Floor
New York, NY 10022–3915
(212) 850–6103
Fax: (212) 223–1942
Email: schulzd@ballardspahr.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Chad R. Bowman**

1

BALLARD SPAHR LLP
1909 K Street, NW
12th Floor
Washington, DC 20006
(202) 508–1120
Fax: (202) 661–2299
Email: bowmanchad@ballardspahr.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 05/15/2017 | 1 | | COMPLAINT against THE ASSOCIATED PRESS with Jury Demand ( Filing fee $ 400 receipt number 0090–4952515) filed by OLEG V. DERIPASKA. (Attachments: # 1 Civil Cover Sheet, # 2 Summons)(Schiller, Jonathan) (Entered: 05/15/2017) |
| 05/15/2017 | | | Case Assigned to Judge Ellen S. Huvelle. (jd) (Entered: 05/17/2017) |
| 05/17/2017 | 2 | | SUMMONS (1) Issued Electronically as to ASSOCIATED PRESS. (Attachment: # 1 Consent Forms)(jd) (Entered: 05/17/2017) |
| 05/19/2017 | 3 | | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. ASSOCIATED PRESS served on 5/18/2017, answer due 6/8/2017 (Schiller, Jonathan) (Entered: 05/19/2017) |
| 06/02/2017 | 4 | | Consent MOTION for Extension of Time to File Answer re 1 Complaint by ASSOCIATED PRESS (Attachments: # 1 Text of Proposed Order)(Bowman, Chad) (Entered: 06/02/2017) |
| 06/02/2017 | 5 | | Corporate Disclosure Statement by ASSOCIATED PRESS. (Bowman, Chad) (Entered: 06/02/2017) |
| 06/06/2017 | | | MINUTE ORDER granting 4 Consent Motion for Extension of Time to Answer: Upon consideration of Defendant's Consent Motion for Extension of Time to Respond to Plaintiff's Complaint, it is hereby ORDERED that the motion is GRANTED; and it is further ORDERED that Defendant shall answer or otherwise respond to Plaintiff's Complaint on or before July 10, 2017. Signed by Judge Ellen S. Huvelle on June 6, 2017. (AG) (Entered: 06/06/2017) |
| 07/03/2017 | 6 | | MOTION to Dismiss *Under Fed. R. Civ. P. 12(b)(6)* by ASSOCIATED PRESS (Attachments: # 1 Declaration of David A. Schulz, # 2 Exhibit A to David A. Schulz Decl., # 3 Exhibit B to David A. Schulz Decl., # 4 Text of Proposed Order)(Schulz, David) (Entered: 07/03/2017) |
| 07/03/2017 | 7 | | MOTION to Dismiss *Under the D.C. Anti–SLAPP Act* by ASSOCIATED PRESS (Attachments: # 1 Declaration of Chad R. Bowman, # 2 Exhibit A to Bowman Decl., # 3 Exhibit B to Bowman Decl., # 4 Text of Proposed Order)(Schulz, David) (Entered: 07/03/2017) |
| 07/13/2017 | 8 | | Joint MOTION for Extension of Time to File Response/Reply as to 6 MOTION to Dismiss *Under Fed. R. Civ. P. 12(b)(6)*, 7 MOTION to Dismiss *Under the D.C. Anti–SLAPP Act* by OLEG V. DERIPASKA (Schiller, Jonathan) (Entered: 07/13/2017) |
| 07/13/2017 | | | |

| | | | |
|---|---|---|---|
| | | | MINUTE ORDER granting <u>8</u> plaintiff's Motion for Extension of Time to File Response re <u>6</u> defendant's MOTION to Dismiss *Under Fed. R. Civ. P. 12(b)(6)* and <u>7</u> defendant's MOTION to Dismiss *Under the D.C. Anti−SLAPP Act*: This Court, having reviewed the parties' Joint Consent Motion for Extension of Time, hereby GRANTS the Motion and ORDERS that Plaintiff shall respond to Defendant's Motion to Dismiss and Special Motion to Dismiss Pursuant to the District of Columbia Anti−SLAPP Act on or before August 16, 2017, and that Defendant shall reply to such response on or before September 8, 2017. Signed by Judge Ellen S. Huvelle on July 13, 2017. (AG) (Entered: 07/13/2017) |
| 08/16/2017 | <u>9</u> | | Memorandum in opposition to re <u>7</u> MOTION to Dismiss *Under the D.C. Anti−SLAPP Act* filed by OLEG V. DERIPASKA. (Attachments: # <u>1</u> Text of Proposed Order)(Sherman, Jonathan) (Entered: 08/16/2017) |
| 08/16/2017 | <u>10</u> | | Memorandum in opposition to re <u>6</u> MOTION to Dismiss *Under Fed. R. Civ. P. 12(b)(6)* filed by OLEG V. DERIPASKA. (Attachments: # <u>1</u> Text of Proposed Order)(Sherman, Jonathan) (Entered: 08/16/2017) |
| 09/08/2017 | <u>11</u> | | REPLY to opposition to motion re <u>6</u> MOTION to Dismiss *Under Fed. R. Civ. P. 12(b)(6)* filed by ASSOCIATED PRESS. (Schulz, David) (Entered: 09/08/2017) |
| 09/08/2017 | <u>12</u> | | REPLY to opposition to motion re <u>7</u> MOTION to Dismiss *Under the D.C. Anti−SLAPP Act* filed by ASSOCIATED PRESS. (Schulz, David) (Entered: 09/08/2017) |
| 10/17/2017 | <u>13</u> | | NOTICE of Change of Address by David A. Schulz (Schulz, David) (Entered: 10/17/2017) |
| 10/17/2017 | <u>14</u> | | NOTICE of Change of Address by Chad R. Bowman (Bowman, Chad) (Entered: 10/17/2017) |
| 10/17/2017 | <u>15</u> | | ORDER denying <u>7</u> Motion to Dismiss Under the D.C. Anti−SLAPP Act for the reasons stated in the accompanying Memorandum Opinion. Signed by Judge Ellen S. Huvelle on October 17, 2017. (lcesh2) (Main Document 15 replaced on 10/18/2017) (zjf). (Entered: 10/17/2017) |
| 10/17/2017 | <u>16</u> | | MEMORANDUM OPINION in support of <u>15</u> Order denying <u>7</u> Defendant's Motion to Dismiss Under the D.C. Anti−SLAPP Act. Signed by Judge Ellen S. Huvelle on October 17, 2017. (lcesh2) (Entered: 10/17/2017) |
| 10/17/2017 | <u>17</u> | 27 | ORDER granting <u>6</u> Defendant's Motion to Dismiss Under Federal Rule of Civil Procedure 12(b)(6) for the reasons stated in the accompanying Memorandum Opinion. Signed by Judge Ellen S. Huvelle on October 17, 2017. (lcesh2) (Entered: 10/17/2017) |
| 10/17/2017 | <u>18</u> | 6 | MEMORANDUM OPINION in support of <u>17</u> Order granting <u>6</u> Defendant's Motion to Dismiss Under Federal Rule of Civil Procedure 12(b)(6). Signed by Judge Ellen S. Huvelle on October 17, 2017. (lcesh2) (Entered: 10/17/2017) |
| 11/20/2017 | <u>19</u> | 4 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to <u>17</u> Order on Motion to Dismiss by OLEG V. DERIPASKA. Filing fee $ 505, receipt number 0090−5215170. Fee Status: Fee Paid. Parties have been notified. (Sherman, Jonathan) (Entered: 11/20/2017) |

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| OLEG V. DERIPASKA,<br><br>        Plaintiff,<br><br>v.<br><br>THE ASSOCIATED PRESS,<br><br>        Defendant. | Case No. 1:17-cv-913-ESH |

## NOTICE OF APPEAL

Notice is hereby given this 20th day of November 2017, that Plaintiff Oleg V. Deripaska hereby appeals to the United States Court of Appeals for the District of Columbia Circuit from the order granting Defendant's motion to dismiss, originally entered in this action on October 17, 2017 (ECF No. 17), and replaced on October 19, 2017.

Respectfully submitted,

/s/ Jonathan Sherman
Jonathan D. Schiller (DC Bar No. 185496)
jschiller@bsfllp.com
575 Lexington Avenue, 7th Floor
New York, NY 10022
Tel: (212) 446-2300
Fax: (212) 446-2350

Jonathan Sherman (DC Bar No. 468539)
jsherman@bsfllp.com
1401 New York Avenue, NW
Washington, DC 20005
Tel: (202) 237-2727
Fax: (202) 237-6131

*Attorneys for Plaintiff*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 20th day of November 2017, I caused a true and correct copy of the foregoing Notice of Appeal to be served via the Court's ECF system upon counsel for the Defendant.

*/s/ Jonathan Sherman*
Jonathan Sherman

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| OLEG V. DERIPASKA, | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 17-00913 (ESH) |
| THE ASSOCIATED PRESS, | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Oleg Deripaska, a self-described private investor and industrialist, has sued the Associated Press ("AP"), claiming defamation by direct statements and by implication.  He argues that the AP falsely accused him of "involvement in criminal activities and other improprieties."  (Compl. ¶ 4.)  The AP has filed two motions to dismiss, one under Federal Rule of Civil Procedure 12(b)(6), and the other under the District of Columbia Anti-Strategic Lawsuits Against Public Participation (Anti-SLAPP) Act of 2010, D.C. Code § 16-5502(a).  Upon consideration of the motions, opposition, and record, the Court finds that Deripaska has failed to state a claim upon which relief can be granted and therefore grants the defendant's motion to dismiss under Rule 12(b)(6).  A separate Memorandum Opinion, ECF No. 16, addresses the AP's Anti-SLAPP special motion to dismiss.

## BACKGROUND

The facts here are relatively straightforward.  On March 22, 2017, the AP separately published an article and online video discussing the relationship between Donald Trump's former campaign manager Paul Manafort and Russia.  (Compl. ¶¶ 5–7, ECF No. 1.)

6

The article opens with the sentence, "Before signing up with Donald Trump, former campaign manager Paul Manafort secretly worked for a Russian billionaire with a plan to 'greatly benefit the Putin Government,' The Associated Press has learned."  (Exh. A at 1, ECF No. 6.)  The article goes on to explain that "Manafort proposed a confidential strategy plan as early as June 2005" to Deripaska, (*id.*), who is described as an "aluminum magnate" and "a close Putin ally with whom Manafort eventually signed a $10 million annual contract beginning in 2006."  (*Id.* at 2.)  Deripaska alleges that the article contains three defamatory statements and that it defames him when read as a whole.  (Compl. ¶¶ 5–7, ECF No. 1.)

The three alleged defamatory "statements" are each comprised of between two and four non-consecutive sentences pulled from the article.  The first statement includes a sequence of alleged falsehoods that Deripaska claims inculpate him in criminal activity.  (Compl. ¶¶ 15–26.)  Deripaska alleges that the following three sentences make up the first statement:  1) "Manafort worked for Deripaska pursuant to a 2005 strategy plan that was to 'greatly benefit the Putin Government'" (Opp. Mot. Dismiss at 9–10, ECF No. 10); 2) "The federal Foreign Agents Registration Act requires that 'people who lobby in the U.S. on behalf of foreign political leaders or political parties must provide detailed reports about their actions to the department," and "[w]illfully failing to register [under FARA] is a felony"  (*id.* at 10); and 3) "Manafort did not disclose details about the lobbying work to the Justice Department during the period the contract was in place."  (*Id.*)  Deripaska argues that by "express[ing] certainty about the connection between the plans set forth in the 2005 Manafort Memo and funds paid by Mr. Deripaska to Mr. Manafort" (Compl. ¶ 17), alongside the assertion that the memo proposed a "model [to] greatly benefit the Putin Government," (*id.* ¶ 16), the AP made "a false and defamatory statement."  (*Id.* ¶ 18.)  Specifically, Deripaska alleges that the AP "assert[ed] in substance that Mr. Deripaska

paid Mr. Manafort to act as an unregistered foreign agent," and thus made "him appear to have been engaged in criminal conduct."  (*Id.* ¶ 24.)

As for the second allegedly defamatory statement, Deripaska turns to a quote from United States Senator Lindsey Graham and a statement summarizing the view of the House Intelligence Committee Democrats.  He alleges that the following two sentences makes up the second statement: 1) "Republican Sen. Lindsey Graham of South Carolina, a frequent Trump critic, said of Manafort: 'Clearly if he's getting millions of dollars from a billionaire close to Putin, to basically undermine democratic movements, that's something I'd want to know about" (Opp. at 10); and 2) "Democrats on the House intelligence committee said the new revelations will feature in their investigations."  (*Id.*)  Deripaska claims the second statement "strongly and falsely conveys that Mr. Deripaska's contracts with Mr. Manafort had criminal implications and merit a congressional investigation."  (Compl. ¶ 33.)

The third allegedly defamatory statement strings together several sentences discussing Manafort's involvement in events in the Ukraine in 2014.  (*Id.* ¶¶ 39–50.)  Deripaska alleges that the following language makes up the third defamatory statement: 1) "Deripaska became one of Russia's wealthiest men under Putin, buying assets abroad in ways widely perceived to benefit the Kremlin's interests" (Opp. at 10); 2) "Manafort worked as Trump's unpaid campaign chairman last year from March until August, a period that included the Republican National Convention that nominated Trump in July" (*id.*); and 3) "The newly obtained business records link Manafort more directly to Putin's interests in the region.  According to those records and people with direct knowledge of Manafort's work for Deripaska, Manafort made plans to open an office in Moscow, and at least some of his work in Ukraine was directed by Deripaska, not local political interests there," (*id.*); and 4) "[F]ederal criminal prosecutors became interested in

Manafort's activities years ago as part of a broad investigation to recover stolen Ukraine assets after the ouster of pro-Russian President Viktor Yanukovych there in early 2014." (*Id.*) Deripaska argues that their "juxtaposition . . . reasonably conveys that Mr. Deripaska stole Ukrainian assets in 2014, and that he is implicated in federal prosecutors' investigation of that theft . . . [and] that the alleged theft of assets from Ukraine is somehow tied to the Trump Campaign Controversy." (Compl. ¶ 44.) As a result, Deripaska alleges that "[r]eaders of the Article and of its numerous republications by news outlets around the world have been left with the impression that Mr. Deripaska's private, commercial dealings were—and still may be— deeply intertwined with the Trump Campaign Controversy." (*Id.* ¶ 7.)

The AP has moved to dismiss the complaint under Rule 12(b)(6), arguing that the first statement is not capable of defamatory meaning and is not "of-and-concerning" Deripaska, the second statement is nonactionable because it is both an opinion and privileged, and the third statement does not reasonably convey the defamatory implication alleged. (Mot. Dismiss, ECF No. 6.) The AP also argues in the alternative that Deripaska is a limited-purpose public figure and has failed to allege publication with actual malice. (*Id.* at 28–40.)

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "There is no heightened pleading standard for defamation claims in the District of Columbia." *Intelsat USA Sales Corp. v. Juch-Tech, Inc.*, 935 F. Supp. 2d 101, 117 (D.D.C. 2013) (citing *Solers, Inc. v. Doe*, 977 A.2d 941, 948 (D.C. 2009)). Rather, the Court "must accept the allegations of the complaint as true, drawing all inferences in the plaintiff's favor," and will

dismiss under Rule 12(b)(6) "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Croixland Props. Ltd. P'ship v. Corcoran*, 174 F.3d 213, 215 (D.C. Cir. 1999). But unless a plaintiff is able to nudge his or her claim "across the line from conceivable to plausible," the complaint must be dismissed. *Twombly*, 550 U.S. at 571.

In assessing "whether a complaint states a claim, the court may consider the facts alleged in the complaint, documents attached thereto or incorporated therein, and matters of which it may take judicial notice." *Farah v. Esquire Magazine*, 736 F.2d 528, 534 (D.C. Cir. 2013). "Judicial notice is properly taken of publicly available historical articles," which are in some cases attached to a defendant's motion to dismiss. *Id.* At this stage of review in a defamation case, the Court must "decide whether the disputed article (1) contains express or implied verifiably false statements of fact, which (2) are reasonably capable of defamatory meaning or otherwise place appellant in an offensive false light." *Weyrich v. New Republic, Inc.*, 235 F.3d 617, 623 (D.C. Cir. 2001).

## ANALYSIS

"In order to state a claim of defamation, [a] plaintiff must allege and prove four elements: (1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm." *Solers, Inc.*, 977 A.2d at 948.[1] The First Amendment requires that

---

[1] The parties do not dispute that substantive D.C. law applies in this diversity case. *See, e.g.*, *Weyrich*, 235 F.3d at 626–27 (discussing choice of law in a defamation action brought in a diversity case in D.C.).

where a public figure pursues a libel action, the public figure must ultimately "demonstrate by clear and convincing evidence that the defendant published the defamatory falsehood with 'actual malice,' that is, with 'knowledge that it was false or with reckless disregard of whether it was false or not.'" *Liberty Lobby, Inc. v. Dow Jones & Co., Inc.*, 838 F.2d 1287, 1292 (D.C. Cir. 1988) (quoting *N.Y. Times v. Sullivan*, 376 U.S. 254, 280 (1964)).

Actionable statements must be *both* false and defamatory. *Rosen v. Am. Israel Pub. Affairs Comm., Inc.*, 41 A.3d 1250, 1256 (D.C. 2012). Only publications tending "to injure plaintiff in his trade, profession or community standing, or lower him in the estimation of the community" can be defamatory. *Id.* And defamatory speech must rise to the level of making the plaintiff appear "odious, infamous, or ridiculous"—it cannot be merely unpleasant or offensive. *Id.* Liability for a statement on a matter of public concern "may be imposed only if the statement is provably false." *Guilford Transp. Indus., Inc. v. Wilner*, 760 A.2d 580, 596 (D.C. 2000) (citing *Milkovich v. Lorain Journal Co. et al.*, 497 U.S. 1, 19–20 (1990)). Although a statement of opinion can be actionable where it implies "a provably false fact, or rel[ies] upon stated facts that are provably false," *id.*, "if it is plain that a speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is not actionable." *Id.* (quoting *Guilford Transp.*, 760 A.2d at 597).

## I.     LIMITED-PURPOSE PUBLIC FIGURE

The AP argues that Deripaska is a limited-purpose public figure "who has fairly exposed himself to public discussion through his activities." (Mot. Dismiss at 30.) As it applies to Deripaska, the AP defines the public controversy in question as being over "Russian oligarchs who act as *de facto* emissaries for the Russian government to expand their own influence along

with Russia's."  (Reply Mot. Dismiss at 16, ECF No. 11.)  The AP also argues that Deripaska

has only alleged actual malice in a conclusory fashion.  (Mot. Dismiss at 28.)  Deripaska

counters that "he is not a limited-purpose public figure with respect to the Trump Campaign

Controversy," which he argues is the "essential subject matter of the Article."  (Opp. at 28.)

Moreover, he argues that it is unnecessary to plead actual malice at the motion-to-dismiss stage.

*Id.*  The Court finds that Deripaska is a limited-purpose public figure, and he has failed to

adequately allege the requisite intent.

Whether a plaintiff is a limited-purpose public figure is "a matter of law for the court to

decide."  *Tavoulareas v. Piro*, 817 F.2d 762, 772 (D.C. Cir. 1987).  "The task of determining

whether a defamation plaintiff is a limited-purpose public figure is a difficult one, requiring a

highly fact-intensive inquiry that [some have] described as 'trying to nail a jellyfish to the wall.'"

*Doe No. 1 v. Burke*, 91 A.3d 1031, 1041–42 (D.C. 2014) (quoting *Moss v. Stockard*, 580 A.2d

1011, 1030 (D.C. 1990)).  Nevertheless, a "limited-purpose public figure is 'an individual (who)

voluntarily injects himself or is drawn into a particular public controversy and therefore becomes

a public figure for a limited range of issues.'"  *Waldbaum v. Fairchild Pubs., Inc.*, 627 F.2d

1287, 1292 (D.C. Cir. 1980) (quoting *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351 (1974)).

According to the D.C. Circuit, a three-part inquiry is used to determine whether a

plaintiff is a limited-purpose public figure.  "First, the court must identify the relevant

controversy and determine whether it is a public controversy.  Second, the plaintiff must have

played a significant role in that controversy.  Third, the defamatory statement must be germane

to the plaintiff's participation in the controversy."  *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576,

585 (D.C. Cir. 2016) [hereinafter *Jankovic III*] (citing *Waldbaum*, 627 F.2d at 1296–98).  A

public controversy is one where people "actually were discussing some specific question," and

where "the press was covering the debate, reporting what people were saying and uncovering facts and theories to help the public formulate some judgment." *Id.* There may be "multiple potential controversies, and it is often true that 'a narrow controversy may be a phase of another, broader one.'" *Id.* at 586 (quoting *Waldbaum*, 627 F.2d at 1297 n.27). "Indeed, courts often define the public controversy in expansive terms." *Id.* But where a controversy is defined broadly, that is balanced by the next step, which requires that courts determine whether the plaintiff "thrust himself to the forefront of the public controversy at issue." *Id.*

Deripaska is no stranger to news coverage related to his role as a Russian oligarch and one of Putin's closest confidantes. (*See* Mot. Dismiss at 2–9.) The Court notes that Deripaska does not dispute any material facts presented in the AP's discussion of the factual background as it relates to Deripaska's biography and his role in advancing Russian interests internationally. (Opp. at 8 n.4.) Given this concession and the many articles cited that reference Deripaska on this topic (*see e.g.*, Mot. at 2–8, & n.2–33), there can be no doubt a public controversy exists relating to Russian oligarchs acting on behalf of the Russian government. For the purposes of the article in question—which touches on this broader issue as well as narrower concerns relating to the Trump campaign's contacts with Russia—Deripaska is a limited-purpose public figure.

Moreover, Deripaska has certainly "thrust himself to the forefront" of that controversy. *See Jankovic III*, 822 F.3d at 586. Included among the undisputed biographical details is the fact that "Deripaska is widely known as 'Putin's oligarch,' and has boasted to reporters: 'I don't separate myself from the state.'" (Mot. Dismiss at 4.) And, the article's allegedly defamatory statements relate to these very issues for they describe Deripaska as a Russian oligarch who allegedly contracted with an American to promote Russian interests. This is precisely the area in which Deripaska can be fairly described as a limited-purpose public figure who has pursued a

8

central place in a public controversy, particularly given that Deripaska has been the subject of more than a decade of media coverage on topics related to his wealth and his relationship with the Russian government.[2]

As such, Deripaska is required to plausibly allege that the AP "published the defamatory falsehood with 'actual malice,' that is, with 'knowledge that it was false or with reckless disregard of whether it was false or not.'" *Liberty Lobby,* 838 F.2d at 1292 (quoting *N.Y. Times,* 376 U.S. at 280); *see also Twombly,* 550 U.S. at 571.  Deripaska does not succeed in doing so. Rather, he claims that the AP's failure to include details about the Ukraine's domestic political situation in 2005 indicates that the reporters were intentionally omitting "crucial background." (Opp. at 7–8.)  As the AP points out, this simply is not enough to make out a plausible case of actual malice.

Although Deripaska argues that alleging malice is unnecessary at this stage, his citation for this assertion is *Weyrich,* where the D.C. Circuit stated that the second element of a false light claim under D.C. law "tracks the First Amendment's intent requirement for defamation claims brought by public figures, and the court at this stage assumes the requisite state of mind." 235 F.3d at 628.  No citation follows this statement "assum[ing] the requisite state of mind." *Id.* Upon consulting the relevant briefs, the Court finds that this is likely because the parties in

---

[2] *See, e.g.,* Tom Winter et al., *Donald Trump Aide Paul Manafort Scrutinized for Russian Business Ties,* NBC News (Aug. 18, 2016), http://www.nbcnews.com/news/us-news/donald-trump-aide-paul-manafort-scrutinized-russianbusiness-ties-n631241 ("Deripaska . . . is considered by U.S. officials to be among Putin's inner circle of billionaire businessmen."); Olivia Lang, *Davos 2011: Day 2 as it happened,* BBC News (Jan. 27, 2011), http://news.bbc.co.uk/2/hi/business/davos/9377609.stm ("One of the world's richest men, Russian aluminum king Oleg Deripaska, has been defending his country against claims that investors are put off by politicians meddling in business."); *How to Make a Billion Dollars: Oleg Deripaska, Aluminum King,* Frontline World (Oct. 2003), http://www.pbs.org/frontlineworld/stories/moscow/deripaska.html.

*Weyrich* argued that "[i]f a statement cannot be proven obviously false, then it is impossible to find 'actual malice' as a matter of law."  Br. for Appellee at 19 & n.10, *Weyrich*, 235 F.3d 617 (2001); *see id.* at 54–55 (making the same argument as to a false light claim).  In a later decision, the D.C. Circuit cited *Weyrich* for the proposition that the "court must also assume that [the defendant] made such statements with the requisite state of mind."  *Farah v. Esquire Magazine*, 736 F.3d 528, 534 (D.C. Cir. 2013).  Despite this seemingly broad pronouncement, courts still grant motions to dismiss based in part on the failure of a public figure to plausibly allege facts that support an inference of actual malice in a defamation case.  *See, e.g.*, *Parisi v. Sinclair*, 845 F. Supp. 2d 215, 218–19 (D.D.C. 2012) (dismissing the complaint where it contained "*no* factual allegation, other than the plaintiffs' own assertions that the statements were false"); *Boley v. Atl. Monthly Grp.*, 950 F. Supp. 2d 249, 262–63 (D.D.C. 2013).  Certainly, a plaintiff may not need to invoke the magic words "actual malice," *cf. Parsi v. Daioleslam*, 778 F.3d 116, 131 (D.C. Cir. 2015), but the complaint must "adequately allege[] facts that support an inference that Defendant[] published the defamatory statements . . . with actual malice."  *Zimmerman v. Al Jazeera Am., LLC*, 246 F. Supp. 3d 257, 280 (D.D.C. 2017).

It is true that "a plaintiff may prove the defendant's subjective state of mind through the cumulation of circumstantial evidence, as well as through direct evidence," but "actual malice does not automatically become a question for the jury whenever the plaintiff introduces pieces of circumstantial evidence tending to show that the defendant published in bad faith."  *Tavoulareas*, 817 F.2d at 789.  The kinds of evidence that would "likely support a finding of actual malice" include evidence of fabrication, evidence that the story was "so inherently improbable that only a reckless man would have put [it] in circulation," and evidence that it was "based wholly on an unverified anonymous telephone call or some other source that the defendant had obvious

reasons to doubt." *Id.* at 790 (quoting *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968)).

In *Lohrenz v. Donnelly*, 350 F.3d 1272 (D.C. Cir. 2003), the D.C. Circuit explained that

even where the defendants "acted on the basis of a biased source and incomplete information," it

was not enough to demonstrate that they "realized that [their] statement was false or that [they]

subjectively entertained serious doubts as to the truth of [their] statement." *Id.* at 1284 (citing

*Bose Corp. v. Consumers Union of U.S.*, 466 U.S. 485, 511 n.30 (1984)).  In making an actual

malice determination, courts must "exercise particularly careful review," and "make an

independent examination of the whole record." *Tavoulareas*, 817 F.2d at 789.

Deripaska makes an accusation that does not come close to plausibly alleging that the AP

acted with actual malice or reckless disregard for the facts when it published the article in

question.  *See Lohrenz*, 359 F.3d at 1285 ("Even where doubt-inducing evidence could be

discovered, a publisher may still opt not to seek out such evidence and may rely on an informed

source, so long as there is no 'obvious reason to doubt' that source.").  Even if more information

had been included about Deripaska's business interests in Ukraine, it would not have undermined

the conclusion that he was also engaged in advancing Russian interests more broadly, because, as

the AP persuasively points out, "the two are not mutually exclusive."  (Reply at 22.)

Accordingly, the Court concludes that as a limited-purpose public figure, Deripaska

failed to adequately allege actual malice, but in the alternative, even if he has alleged actual

malice, he failed to state a claim upon which relief can be granted for the reasons that follow.

**II.      STATEMENT 1**

Although Deripaska characterizes the first allegedly defamatory statement in a variety of

ways, the Court best understands Deripaska to argue that the AP's article "includes verifiably

false allegations: that Deripaska had an arrangement with Manafort to 'greatly benefit the Putin

Government,' that they had entered into a contract to implement the plans in the memo, that Mr. Manafort's dealings pursuant to that contract involved unregistered lobbying the United States on behalf of Deripaska, and that Deripaska is therefore implicated in criminal activity." (Opp. at 18–19.) The AP responds that the article asks "whether *Manafort* should have registered as a foreign agent but does not reach any conclusion beyond this point" (Reply at 5), making it impossible to find an implication that Deripaska is criminally liable under the Foreign Agent Registration Act. First, whether Manafort violated the law was presented as a question and second, the question was about Manafort, not about Deripaska. (*Id.* at 5–6.) Moreover, to the extent that Deripaska argues that associating him with the Russian government is defamatory (Opp. at 25), the AP correctly suggests there is "no legal support for allowing a Russian citizen with a diplomatic visa to maintain a libel claim based on a statement associating him with his home country." (Reply at 7.)

"Defamation is personal; a plaintiff who alleges defamation must show that the statement was published 'of and concerning' him." *Provisional Gov't of Republic of New Afrika v. Am. Broad. Cos., Inc.*, 609 F. Supp. 104, 108 (D.D.C. 1985) (alterations omitted). "To satisfy the 'of and concerning' element, it suffices that the statements at issue lead the listener to conclude that the speaker is referring to the plaintiff by description, even if the plaintiff is never named or is misnamed." *Jankovic v. Int'l Crisis Grp.*, 949 F.3d 1080, 1088–89 (D.C. Cir. 2007) [hereinafter *Jankovic I*] (citing *Croixland*, 174 F.3d at 216).

In addition, the D.C. Circuit in *Abbas v. Foreign Policy Group, LLC*, 783 F.3d 1328 (D.C. Cir. 2015), followed the "widely adopted defamation principle that questions are questions," *id.* at 1339, and explained that "as a matter of defamation law . . . a question, 'however embarrassing or unpleasant to its subject, is not [an] accusation.'" *Id.* at 1338 (quoting

12

*Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1094 (4th Cir. 1993)).  Because questions

"indicate a defendant's lack of definitive knowledge about the issue . . . posing questions has

rarely given rise to successful defamation claims."  *Id.*  Nevertheless, "a question's wording or

tone or context sometimes may be read as *implying* the writer's answer to that question."  *Id.*

at 1339.

 Here, any possible answer to the question does not implicate Deripaska in a crime.

Deripaska claims that three sentences together make up the first statement.  (Opp. at 9–10).  The

three sentences are: 1) "Manafort worked for Deripaska pursuant to a 2005 strategy plan that was

to 'greatly benefit the Putin Government'" (*id.* at 10); 2) "The federal Foreign Agents

Registration Act requires that 'people who lobby in the U.S. on behalf of foreign political leaders

or political parties must provide detailed reports about their actions to the department,' and

'[w]illfully failing to register [under FARA] is a felony'" (*id.*); and 3) "Manafort did not disclose

details about the lobbying work to the Justice Department during the period the contract was in

place.'"  (*Id.*)  The article also states in relevant part that "Manafort told Deripaska in 2005 that

he was pushing policies as part of his work in Ukraine 'at the highest levels of the U.S.

government—the White House, Capitol Hill and the State Department,'" but "Manafort did not

disclose details about the lobbying work to the Justice Department during the period the contract

was in place."  (Exh. A at 4.)  After describing the Foreign Agents Registration Act, the article

quotes Graham: "'I don't know if he violated the Foreign Agent Registration Act,' Sen. Graham

said, 'but it's something I think we all need to know more about.'"  (*Id.*)

 This discussion, while not literally formulated as a question, presents a hypothetical that

is inconclusive even as to Manafort, let alone Deripaska.  If it implies that anyone broke the law,

the subject of that implication is limited to Manafort only.  "[W]here the expressed facts are

literally true"—and Deripaska does not allege that most of the facts recited above are false[3]—
"[t]he language must not only be reasonably read to impart the false innuendo, but it must also
affirmatively suggest that the author intends or endorses the inference." *Guilford Transp.*,
760 A.2d at 597 (citing *Chapin*, 993 F.2d at 1092–93). Even assuming *arguendo* that the AP
unequivocally stated that Manafort had engaged in criminal activity, nothing in the article can be
read to impart that *Deripaska* engaged in criminal lobbying activity or "conspired to commit
alleged acts that would constitute violations of U.S. criminal law." (*See* Opp. at 2.)

Deripaska also attempts to argue that even stating that he entered into a contract with
Manafort to support Russian interests abroad is false and defamatory standing alone. (Opp. at 4;
*see* Mot. Dismiss at 1.) Assuming, as the Court must at this stage, that this assertion is indeed
false, it remains unclear, under the circumstances, what about it is defamatory.

The D.C. Circuit has explained that where a "tie [to a political regime] is sufficiently
'odious, infamous, or ridiculous,' then the complaint has properly stated a cause of action for
defamation." *Jankovic I*, 949 F.3d at 1091. "Merely associating somebody with a foreign
government would not ordinarily be defamatory," *id.*, but at least two examples show that it can
be. In *Jankovic I*, the plaintiff was described as a 'crony' of the Milosevic regime in Serbia,
which had committed war crimes, and so the D.C. Circuit concluded the association was enough
to state a prima facie case of defamation. *Id.* By contrast, while indicating in *Southern Air
Transport, Inc. v. American Broadcasting Companies, Inc.*, 877 F.2d 1010 (D.C. Cir. 1989), that
inferring dealings between the plaintiff company and the South African government "clearly
would have a defamatory meaning because of the intense antipathy felt by a great number of

---

[3] Deripaska apparently argues that AP's reporting that he had a contract with Manafort to benefit
the Putin government is itself false and defamatory, but, as explained *infra*, the Court flatly
rejects that argument.

Americans towards South Africa," the D.C. Circuit considered the report in question "as a whole" and concluded that "a reasonable viewer could not infer" such a partnership from the report. *Id.* at 1015.

Here, the question must be, if Deripaska and Manafort did not have a contract to further Russian interests, is it defamatory for the AP to say they did?  Under the circumstances, the answer must be no.  Deripaska does not deny that a contract in some form existed.  (Opp. at 6.)  Moreover, it is readily available, judicially noticeable information that Deripaska openly associates himself with the Russian government.[4]  For the AP to do the same cannot be defamatory, even if it were not true.

In yet another stretch regarding the first statement, possibly in an attempt to explain how having a contract to further Russian interests might be defamatory, Deripaska argues that the article "indicates that Deripaska's business dealings implicate criminal activity related to government corruption."  (Opp. at 24–25.)  But the article makes no reference to government corruption.  Rather, it describes Manafort's strategy memos as proposing that "Deripaska and Putin would benefit from lobbying Western governments, especially the U.S., to allow oligarchs to keep possession of formerly state-owned assets in Ukraine."  (Exh. A at 4.)  Further, Manafort "proposed building 'long term relationships' with Western journalists and a variety of measures to improve recruitment, communications and financial planning by pro-Russian parties in the region."  (*Id.*)  None of this is defamatory to Deripaska.  Defamation is not made up of hints and suggestions and it cannot be merely unpleasant or offensive.  *Cf. Milkovich*, 497 U.S. at 21 (noting that "loose, figurative, or hyperbolic language . . . would negate the impression that the

---

[4] *See, e.g.*, Mark Ames & Ari Berman, *McCain's Kremlin Ties*, The Nation (Oct. 1, 2008), https://www.thenation.com/article/mccains-kremlin-ties/.

writer was seriously maintaining that petitioner committed the crime"). Thus, even if the article

falsely states that Deripaska and Manafort had a contract to promote Russian interests, as the

Court assumes here, that statement fails to convey any defamatory meaning.

### III.   STATEMENT 2

Deripaska argues that two sentences comprise the second statement: 1) "Republican Sen.

Lindsey Graham of South Carolina, a frequent Trump critic, said of Manafort: 'Clearly, if he's

getting millions of dollars from a billionaire close to Putin, to basically undermine democratic

movements, that's something I'd want to know about'" (Opp. at 10); and 2) "Democrats on the

House intelligence committee said the new revelations will feature in their investigations." (*Id.*)

The AP responds that these statements are "subjective assessments . . . not capable of being

proven true or false" (Reply at 8), and even if they "could reasonably be interpreted as making an

actionable allegation of wrongdoing, AP's neutral reporting of those allegations is itself

protected from liability under the First Amendment." (Mot. Dismiss at 22–23.)

Determining whether an utterance is fact or opinion requires viewing the "totality of the

circumstances" with four specific factors in mind:  "(1) the specific language used; (2) whether

the statement is verifiable; (3) the general context of the statement; and (4) the broader context in

which the statement appeared." *Milkovich*, 497 U.S. at 9; *see also Ollman v. Evans*, 750 F.2d

970, 982 (D.C. Cir. 1984) (noting that "the distinction between fact and opinion can . . . be made

only in context").

First, the Graham quote begins with a conditional "if," suggesting anything but certainty.

Second, to attach meaning to the use of the present tense when a Senator is interacting with the

press is unreasonable.  Third, Graham is speaking in reaction to information about Manafort's

undisclosed business dealings with a Russian businessman, and not surprisingly, Graham says he

16

would like to know more about what he's hearing.  This expresses a desire for more information, rather than a statement "laden with factual content."  *See Ollman*, 750 F.2d at 981–82 ("An obvious potential for quashing or muting First Amendment activity looms large when juries attempt to assess the truth of a statement that admits of no method of verification.").  In addition, the word "basically" preceding the phrase "undermine democratic movements" is a red flag that Graham is using "loose" or "hyperbolic" language.  *See Letter Carriers v. Austin*, 418 U.S. 264, 284–86 (1974) (explaining that the word "traitor" used to define a union "scab" could not form the basis for a defamation action because it was used "in a loose, figurative sense" and was "merely rhetorical hyperbole, a lusty and imaginative expression of the contempt felt by union members").

Deripaska does not actually dispute that Graham said what the AP reported in its article nor does he dispute that "Democrats on the House intelligence committee said the new revelations will feature in their investigations."  (Exh. A at 4.)  Instead, he argues that "'ordinary, reasonable readers could read the [article]' as asserting that Deripaska's business deals are worth investigating and may involve 'undermin[ing] democratic movements.'"  (Opp. at 21) (quoting *Competitive Enter. Inst. v. Mann*, 150 A.3d 1213, 1245 (D.C. 2016)).  But whether Deripaska's business deals are worth investigating is not a verifiable statement of fact.  *Guilford Transp.*, 760 A.2d at 597 (A statement is not actionable "if it is plain that a speaker is expressing a subjective view . . . rather than claiming to be in possession of objectively verifiable facts.")  What Deripaska believes the quote material conveys cannot be verified as fact or falsehood.

## IV.    STATEMENT 3

Deripaska argues here that a series of sentences pulled from a section of the article "[t]aken as a whole . . . are lies."  (Opp. at 11.)  He claims the article implies that he was

17

involved in the Trump campaign controversy and that his "ordinary business arrangement" with Manafort lasted longer than it actually did, and that the characterization of his work with Manafort to "advance the interests of the Russian government" is false.  *Id.*  Deripaska also argues the article implies that he stole or helped Manafort steal assets from Ukraine or elsewhere. *Id.*  The AP responds that the article does not reasonably give rise to these implications and in fact contradicts them at various points.  (Reply at 10–11.)

"Defamation by implication 'stems not from what is literally stated, but from what is implied.'"  *Mar-Jac Poultry, Inc. v. Katz*, 773 F. Supp. 3d 103, 115 (D.D.C. 2011) (quoting *White v. Fraternal Order of Police*, 909 F.2d 512, 518 (D.C. Cir. 1990)).  "[C]ourts must be vigilant not to allow an implied defamatory meaning to be manufactured from words not reasonably capable of sustaining such meaning."  *White*, 909 F.2d at 519.  But "[i]t is no defense that the defendant did not actually intend to convey the defamatory meaning, so long as the defamatory interpretation is a reasonable one."  *Id.*; *see also Restatement (Second) of Torts* § 563 (1977).  In *White*, the D.C. Circuit analyzed three defamation-by-implication cases and concluded that "if a communication, viewed in its entire context, merely conveys materially true facts from which a defamatory inference can reasonably be drawn, the libel is not established." *Id.* at 520.  If "the particular manner or language" used "supplies additional, affirmative evidence suggesting that the defendant *intends* or *endorses* the defamatory inference," only then will the communication "be deemed capable of bearing that meaning."  *Id.*

The article cannot be read to suggest that Deripaska is personally involved in the Trump campaign controversy or is accused of stealing Ukrainian assets.[5]  The article must be read as a

---

[5] Deripaska also argues that the separate online video that the AP published on March 22, 2017, "is a tacit admission by the AP that a reasonable reader would conclude from the Article that Deripaska had hired Manafort to subvert democratic movements" because "if not, there would be

whole, not through the selective lens that Deripaska presents.  *White*, 909 F.2d at 526 ("[A] court

must examine the entire context of a publication.").  Read as a whole, although the article jumps

backwards and forwards in time with respect especially to Deripaska, it specifically includes

facts that negate the implications that Deripaska conjures up.  For example, early on, the article

quotes an official representative of Deripaska indicating that his contract with Manafort related

to investment consulting services "which now is a subject to legal claims."  (Exh. A at 2.)  Later

the article notes that "federal criminal prosecutors became interested in Manafort's activities

years ago as part of a broad investigation to recover stolen Ukraine assets after the ouster of pro-

Russian President Viktor Yanukovych there in early 2014," which is immediately followed by

the statement that no "U.S. criminal charges have ever been filed in the case."  (*Id.* at 3.)  The

article also states that Deripaska was never mentioned "during the hearing of the House

intelligence committee," where Manafort was mentioned 28 times "mostly about his work in

Ukraine."  (*Id.*)  Later, in discussing the relationship with Manafort, the article explains "people

familiar with the relationship said money transfers to Manafort amounted to tens of millions of

dollars and continued through at least 2009."  (*Id.* at 4.)  Toward the end, the article states that

"Manafort's work with Deripaska continued for years, though they had a falling out laid bare in

2014 in a Cayman Islands bankruptcy court."  (*id.* at 5.)  While this information is spread

---

no reason to post a video expressly disavowing that implication."  (Opp. Mot. Dismiss at 11.)
This logic is befuddling.  It is far more likely that the AP published an online video that it
understood to be consistent with the article it published on the same day on the same topic.

    Although the AP does not argue that the Court should consider the video as providing
even greater context for the article, the Court does note that this Circuit has reflected on "the
impact of visual effects," because "the television medium offers the publisher the opportunity,
through visual presentation, to emphasize certain segments in ways that cannot be ascertained
from a mere reading of the transcript."  *White*, 909 F.2d at 526 (quoting *S. Air Transp.*, 877 F.2d
at 1015)).  In this case, the video appears to emphasize precisely what Deripaska would request
that it emphasize.  (*See* Exh. B.)

throughout the article, all of it is there, making it impossible to find the implications that

Deripaska insists are present.  Accordingly, the third statement cannot convey any actionable

defamatory meaning.

## V.      THE ARTICLE AS A WHOLE

The AP argues that Deripaska "cannot state a free-floating claim for defamation

unmoored to specific false, defamatory statements" (Reply at 11), because a plaintiff must "plead

the defamatory statements with particularity."  (Mot. Dismiss at 26 (quoting *Caudle v.

Thomason*, 942 F. Supp. 635, 638 (D.D.C. 1980).)  Deripaska argues that the article "as a whole

is defamatory because its essential message is that two private emissaries of Presidents Trump

and Putin entered into an agreement to undermine governments of elected leaders."  (Opp. at 2.)

But Deripaska's complaint fails to identify any single statement as false that is both capable of

verification and capable of defamatory meaning.  Reformulating his arguments to infer

defamatory meaning from the article as a whole does not cure this deficiency and so the Court

must dismiss the complaint as a matter of law.

"In a libel case, it is the role of the court to determine whether the challenged statement is

'capable of bearing a particular meaning' and whether 'that meaning is defamatory.'  In making

this determination, a court is to consider both the words themselves and the entire context in

which the statement occurs."  *Tavoulareas*, 817 F.2d at 779.

Deripaska characterizes the article as accusing him of being "jointly engaged in efforts to

advance the Kremlin's anti-democratic agenda."  (Opp. at 9.)  But the article makes no such

statement.  The only statement that comes close is the indeterminately-phrased quote from

Graham, discussed above.  Deripaska has cherry-picked sentences and strung them together to

give the AP's article an effect it does not have when read in full.  But whole context is how

USCA Case #17-7164      Document #1706633         Filed: 11/29/2017      Page 26 of 27

courts determine whether there is defamation.  *See Tavoulareas*, 817 F.2d at 779.  And, for the

reasons discussed in Section II, *supra*, Deripaska cannot argue that merely being associated with

the interests of the Russian government is defamatory, even if it is false in the case of his

contract with Manafort.  Accordingly, the Court must dismiss Deripaska's complaint with

prejudice because the statements in his complaint do not qualify as false and defamatory

statements under D.C. law.  *See Abbas*, 783 F.3d at 1340.

## CONCLUSION

The complaint is dismissed with prejudice for failure to state a claim upon which relief

can be granted.  A separate Memorandum Opinion, ECF No. 14, denying the AP's special

motion to dismiss accompanies this Memorandum Opinion.


/s/   *Ellen Segal Huvelle*
ELLEN SEGAL HUVELLE
United States District Judge


Date:  October 17, 2017

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| OLEG V. DERIPASKA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 17-00913 (ESH) |
| | ) | |
| THE ASSOCIATED PRESS, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

### ORDER

For the reasons set forth in the accompanying Memorandum Opinion, ECF No. 18, it is

hereby

**ORDERED** that defendant's Motion to Dismiss Under Federal Rule of Civil Procedure

12(b)(6), ECF No. 6, is **GRANTED**; and it is further

**ORDERED** that the above-captioned case is **DISMISSED**.


/s/   *Ellen Segal Huvelle*
ELLEN SEGAL HUVELLE
United States District Judge

Date: October 17, 2017

27